# FRANCES R. A. COLLINS et al. *vs.* EMMA COLLINS.

*Conveyance by Husband Before Marriage in Fraud of Dower Rights of Wife—Concealment a Fraud—Conveyance of Property Upon Oral Trust.*

When a man on the eve of his marriage makes a voluntary conveyance of all of his property, reserving a life interest to himself, for the purpose of defeating the marital rights therein of his intended wife, the conveyance being made without her knowledge, although no actual misrepresentation was made to her, such deed is in fraud of the wife and it will be vacated in equity.

A conveyance of land made in pursuance of an oral agreement with the grantee that the latter will convey the property to other parties in a certain contingency creates a trust which will be enforced in equity.

The evidence in this case examined and held insufficient to prove that such an agreement was actually made.

Appeal from the Circuit Court of Baltimore City (SHARP, J.)

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, PEARCE, SCHMUCKER and JONES, JJ.

*William Colton*, for the appellants, submitted the cause on his brief.

*C. Dodd McFarland*, for the appellee.

PEARCE, J., delivered the opinion of the Court.

This appeal is from two decrees of the Circuit Court of Baltimore City, by one of which a conveyance from Michael J. Collins, deceased, to the appellants, of certain leasehold estate in Baltimore City was held to be ineffectual to defeat the dower right therein of his widow, the appellee; and by the other of which, being a supplemental decree, the appellants were required to pay the appellee the sum of $124.87 being the agreed amount of the one-third part of the net rents of said property from the death of Michael J. Collins to the date of the decree.

The facts of the case necessary to be stated are these. Sometime in the year 1890, Michael J. Collins, being then a widower with two children, who are the appellants, began to visit the appellee with a view to marriage, and several years later entered into a marriage engagement with her. This engagement continued until April 12th, 1899, when they were married. On March 22nd, 1899, twenty days before the marriage, Michael J. Collins in consideration of five dollars, and of natural love and affection, secretly conveyed to the appellants, certain leasehold estate, being a dwelling and store house on Harrison street in Baltimore City, subject to a life estate reserved to him by said conveyance, and subject also to an outstanding yearly ground rent of $65.67-100 dollars; and also by deed of the same date, and for the same consideration secretly conveyed to the appellants certain household furniture in said dwelling, and a stock of furniture in said store house, subject to a life estate reserved thereby to said Collins. This was the only property then owned by him and he never acquired any other. All of this property he received under a conveyance from his brother, John W. Collins, sometime in the year 1897, and all of the movable property above mentioned was disposed of by Michael J. Collins in his life time. The stock of furniture was worth from $1,000 to $1,200, and the dwelling and store house at the time the decree was passed rented for $25 per month.

On January 12th, 1900, he executed a will by which he gave to his wife one-third of all his property, and to his two daughters the residue, and made C. Dodd McFarland his executor, and died January 17th, 1901, leaving said will unrevoked. The bill in this case was filed May 19th, 1901, by the appellee against the appellants and the executor, C. Dodd McFarland, alleging the facts above mentioned, and further alleging that the conveyance to the appellants was kept secret from her and did not come to her knowledge until December, 1899; that the same was fraudulently made on the eve of her marriage to deprive her of her marital rights in the estate of her husband, and was void as against her rights in said

estate. The prayer of the bill was that the conveyance of
said leasehold estate to the appellants be declared null and
void. It appeared from the testimony in the case that the
appellee knew during her engagement to her husband that he
owned the property mentioned, that he told her he owned
it absolutely, and that she expected in event of his death
to receive a wife's share therein. The appellants in their an-
swer, allege that at the time of the conveyance from John W.
Collins to their father, he, John W. Collins, was about to sub-
mit to an operation from which it was believed death would
ensue, and that in this anticipation, this conveyance was made
upon the distinct understanding and agreement between the
parties that if John W. Collins should recover, Michael should
reconvey the property to him, but if he should die, Michael
should convey the property to the appellants; that John died
from the effect of the operation and that the conveyance from
Michael to them was in pursuance of said understanding and
agreement, and that Michael was never at any time the owner
of any beneficial interest in said property.

We will consider first therefore what interest Michael had
in this property. It may be conceded that if Michael ac-
cepted the conveyance from his brother upon the verbal un-
derstanding above set forth, then the conveyance by him to
the appellants would be regarded as made in performance of
such agreement, and would be upheld in equity as not
affected by the Statute of Frauds. *In re Duke of Marl-
borough,* 2 Ch. Div. 133; *Giffen* v. *Taylor,* 139 Ind. 573; *Lar-
mon* v. *Knight,* 140 Ill. 232; *Phelps' Jurid. Equity,* sec. 210.
But such a trust must be clearly established, and the proof in
this case falls far short of what is required.

Neither of the appellants had any knowledge of the alleged
agreement. Frances knew nothing except what her aunt,
Mrs. O'Connor, told her, and admitted that when her father
executed and delivered the conveyance to her he said nothing
about any such agreement, and only told her he had made
the deed. Margaret Collins, the other appellant, knew noth-
ing except what her uncle, Patrick Collins, had told her, and
thatw as that their father had conveyed the property to them.

Mrs. O'Connor, a sister of John and Michael Collins, is the only witness who attempts to prove the alleged agreement. She testified that sometime before the operation was performed, John asked her to let him transfer the property to her for Mike's children, and she told him to transfer it to the children in the first place, but he said it would leave him in a bad fix if he got over his sickness, as the youngest child would be too young to transfer it back; that she then said transfer it to their father, and he would transfer it back to John if he got well, and if not, to the children; that Mike was there, and he said he certainly would do this and that after John's death she heard Michael say in the presence of his brother Patrick, that it was John's wish the property should be transferred to Mike's children, and that he, Mike, intended to do it. This is the extent of her knowledge upon this subject. The record does not contain a copy of the deed from John to Michael, nor was Mr. McFarland called as a witness to state what instructions were given as to its preparation, or what knowledge he had as to John's wishes, or the understanding between him and Michael, though it appears from the record that he prepared the deed, and the appellant's counsel states in his brief that the deed was an absolute conveyance.

Robert Price testified that he knew all the parties to this case and had known Michael and Patrick Collins for twenty years; that Michael was easily led and he thought Patrick exercised influence over him.

Emma Sudrow, a daughter of the appellee, testified that on the night of the marriage, when Michael Collins and her mother had gone to be married, she was left at his house with the appellants and Patrick Collins who is now dead; that she was in the kitchen and the others in the dining room and she heard Patrick Collins strike the table and say: "By God, I have settled her all right," and Fannie and Maggie Collins said: "Oh uncle Patrick hush." The appellee testified that when she first learned in December, 1899, of this conveyance, she asked her husband about it; that he at first denied making it, but afterwards admitted it, and said Patrick was the one

who made him do it, that he slept with him and bothered him day and night until it was done, and that when her husband died, Patrick told her all she had to do was to take off her apron, put on her hat and walk out; that as she brought nothing she could not take anything.

Alexander T. Collins, a brother of Michael Collins, testified in reply to a question as to what he knew of the conveyance in question, that after it was made, Patrick Collins told him that he had fixed this woman, Mrs. Collins.

John W. Silverwood, testified that he had known John W. Collins for twenty years, and that while he was very sick, he told him he wanted to convey his property to Mike, but did not say anything about Mike's daughters. The testimony thus summarized, not only fails to establish a trust, but is quite convincing that the conveyance in question was made for the purpose of defeating the appellee's marital rights.

We now come to consider whether a Court of equity will relieve a widow against a voluntary conveyance by the husband of all of his estate, pending an engagement of marriage, without any disclosure to the intended wife, or knowledge on her part of his purpose, though without any express misrepresentation on his part, and we do not think there can be any difficulty in reaching a satisfactory conclusion, either upon principle or authority.

It has long been settled that equity will protect the marital rights of *the husband* against a fraudulent conveyance by the wife, pending a treaty of marriage. In the earlier cases, relief was granted only where some actual fraud, accomplished through misrepresentation or deception was practiced upon the husband; but in later cases concealment alone was held to be fraud for which a conveyance would be set aside. It was first distinctly so held by Lord Thurlow in *Strathmore* v. *Bowes*, 1 Vesey, Jr., 27, although in that case, the decree, upon the facts was adverse to the husband. In subsequent cases, the views of Lord Thurlow in *Strathmore* v. *Bowes*, were fully considered, and bare concealment was pronounced to be fraud in itself. *Goddard* v. *Snow*, 1 Russ. 485; *England* v. *Downs*, 2 Beav. 522; *Taylor* v. *Pugh*, 1 Hare, 603.

In this country, concealment alone has been uniformly held to be fraud *per se* entitling the husband to relief. *Tucker* v. *Andrews*, 13 Me. 124; *Logan* v. *Simmons*, 3 Ired. Eq. 487; *Spencer* v. *Spencer*, 3 Jones Eq. 404; *Ramsay* v. *Joyce*, 1 Mc-Millan's Eq. 236; *Manes* v. *Durant*, 2 Rich. Eq. 403; and other cases to the same effect are collected in *White and Tudor's Leading Cases*, 317.

But we have still to inquire whether the wife will be afforded the same protection against a conveyance by her intended husband.

Upon principle, it is difficult to perceive any sound and satisfactory reason for discrimination against the wife, since it is the *marital right* of the husband which is protected against an ante-nuptial conveyance by the wife, and the *marital right* of the wife, is in itself as perfect as that of the husband. It has been well said in *Chandler* v. *Hollingsworth*, 3 Del. Ch. 114: "Whether the wife's dower, as well as the husband's interest in her estate, is to be protected against fraud, depends not at all upon such considerations as the comparative value of the consideration rendered by each, or the value of their respective rights, but solely upon the fact that there exists a *marital right*, which, in common with all legal rights, is a proper subject of legal protection, whether it be itself of more or less value, or whether it spring from a larger or less consideration rendered. If there could be any ground, in addition to the mere existence of a right defrauded, to evoke a swifter interposition for one sex rather than the other, it would be the consideration that the wife, being of the weaker sex, the more needs legal protection."

There does not appear to be in England any express decision upon the precise question, and the leading text writers upon the subject are not in accord, nor always consistent with themselves. Thus Mr. Roper in his work on *Husband and Wife*, vol. 1, p. 52, says: "The creation of a trust to have the effect of excluding the widow's dower; must be a fair transaction, such an one in which a Court of equity would entertain jurisdiction to execute the trust, or the husband will be consid-

ered the legal owner of the estate, which will consequently give to the wife a title to dower;" yet on page 354, he cites *Ex parte Bell*, 1st Glyn and Jameson, 282, for the doctrine that a voluntary settlement made by the husband, though set aside as fraudulent against creditors, prevents the wife's right of dower, because the husband was not *seised* of an estate in possession. It is pointed out, however, in *Chandler* v. *Hollingsworth, supra,* that that case cannot be taken as a decision of the question here, since it does not appear whether the settlement was made pending a marriage treaty.

Mr. Park in his work on Dower, p. 236, says: "An alienation or settlement by the husband, although immediately before the marriage, and with the express intention of excluding the wife of her dower, could not, it is understood, be impeached as a fraud upon the marital rights of the wife, as in the case of a woman making a settlement of her estates, unknown to her intended husband, on the eve of marriage;" and on page 382, speaking of the same subject, he refers to *Wannock* v. *Lifford*, Co. Litt. 208A, note 1, where LORD HARDWICKE treats it as admitted "that if a man before marriage conveys his estate privately, without the knowledge of his wife, to trustees in trust for himself and his heirs in fee, that will prevent dower." In 1 *Cruise*, 411, it is said: "Where a man, immediately before his marriage, privately and secretly conveys his estate to a trustee for himself, in order to defeat his wife of dower, such conveyance will be deemed fraudulent and void." And in vol. 4, p. 416, he says: "LORD CHIEF BARON GILBERT has said that if a husband seised in fee should, immediately before his marriage, vest the legal estate in trustees to disappoint his intended wife of dower, such a conveyance would be reckoned fraudulent, because it was made with an ill conscience in order to deprive his wife of the provision made for her by the common law."

Mr. Roper on p. 354, suggests that the practice in England of settling jointures in lieu of dower influenced the Courts there in their disposition to withhold from the wife the protection given to the husband against such conveyances, but

that reason cannot operate here, where jointures are unknown
and where dower in lands, and an interest in personal estate
after payment of the husband's debts, is the only provision
made by the law for the wife out of the husband's estate.
This right, in this country necessarily enters more largely into
the wife's expectations in contracting marriage than in Eng-
land, and the measure of protection which may in experience
be fouud adequate there, would be wholly inadequate here.
Here the husband is exempted from any liabilities incurred
there by marriage, and the wife subjected to many, unknown
there, so that the argument there advanced for such discrimi-
nation, and resting upon the alleged inequality of considera-
tion rendered by the wife in marriage, loses whatever force is
claimed for it. Especially is this true in the present case,
where the marriage took place after the passage of chs. 331
and 457 of 1898, which have practically made the marital
rights of husband and wife the same, so far as respects their
property. The American cases seem to concur in extending
to the wife the same protection of her marital rights afforded
the husband. In *Swain* v. *Perine*, 5 Johns. Ch. 482, a deed
given by a husband just before his marriage, to his daughter,
without any consideration and kept secret until after the mar-
riage, was held fraudulent and void, as against the wife's
claim to dower, and in *Petty* v. *Petty*, 4 B. Munroe, 215, the
same ruling was made. In both of these cases the convey-
ance was held fraudulent *in fact* and it was not considered
whether she would have been relieved on the ground of bare
concealment. In the latter case however, it is significant, that
the bill was filed in her husband's lifetime and that relief was
granted though her dower was inchoate only, in order that
she should not be prejudiced by delay, if her dower became
consummate.

In *Smith* v. *Smith*, 2 Halstead Ch. 515, a settlement made
on the day of marriage but before the ceremony, made by a
husband for the benefit of himself and a daughter by a former
marriage with intent to defeat dower, though without actual
misrepresentation, was set aside, the Chancellor saying that:

"A voluntary conveyance by a man, on the eve of marriage, unknown to the intended wife, and made for the purpose of defeating the interest she would acquire by the marriage in his estate, is fraudulent as against her," and adding, "I see no sound distinction between this case, and the like conveyance by a woman." So in *Cranston* v. *Cranston*, 4 Mich. 230, a conveyance by a man to his sons, two weeks before marriage, voluntarily made, with the design to exclude his intended wife, but without misrepresentation, was held void, "as a fraud in law upon her rights accrued directly from the marriage." In *Roland* v. *Roland*, 2 Sneed, 543, a similar conveyance was held void as against the widow, but good as to the heirs, and in *Jenny* v. *Jenny*, 24 Vt. 324, the Court said: "One cannot hold property which he receives as a mere gratuity, or as heir, if so conveyed to him as to defeat the wife of deceased to her dower right."

In *Littleton* v. *Littleton*, 1 Dev. & Battle, (L. R.) 327, the reservation of a life estate to the husband in such a conveyance made by him on the eve of marriage was pronounced bad upon common law principles and as indicating that the donor intended the deed should not interfere with his enjoyment, but should hinder that of the wife, and it will be noted that in both the conveyances in the present case Michael Collins reserved a life estate to himself in the property conveyed to his daughters. In *Tate* v. *Tate*, 1 Dev. & Battle, (Eq.) 27, CHIEF JUSTICE RUFFIN disapproved the English rule in point of justice which he said rested there upon the ground that conveyances had so long acted on that mode of barring dower when there was a settlement that it would be dangerous to overturn it and said: "With us there is no habit of marriage contracts and a woman has a right to enjoy the marital rights promised by the law to a wife, as much as the husband to look to those given to him." In *Kelly* v. *McGrath*, 70 Ala. 79, the Court discusses the reasons upon which the distinction has been made in England, and says no sound reason can be given for distinguishing the ante-nuptial frauds of

the husband from those of the wife, citing 2 *Bishop on Married Women*, sec. 352.

In *Kline* v. *Kline*, 57 Pa. 120, the wife's inchoate right of dower was declared to be entitled to protection in such cases, JUDGE SHARSWOOD saying: "There is perhaps no relation in life in which more unbounded confidence is reposed, than in that existing between persons who are betrothed to each other. To consider such persons as in the same category with buyers and sellers, and to say that they are dealing at arms length, we think is a mistake."

Other cases to the same general effect, are *Murray* v. *Murray*, 11 Ky. Law Rep. 815; *Fennessey* v. *Fennessey*, 84 Ky. 523; *Pomeroy* v. *Pomeroy*, 54 How. Pr. 228; *Young* v. *Carter*, 10 Hun. 199; *Duncan's Appeal*, 43 Pa. 69; *Stone* v. *Stone*, 18 Mo. 391. In the last case it was held a conveyance of *personal property* made by a husband during his last sickness and in expectation of death, with a view to defeat his wife's dower, is void as to her and that case is especially applicable here since the house and lot in question was held by Michael Collins under a ninety-nine year lease renewable forever, which was held in *Spangler* v. *Stanler*, 1 Md. Ch. 20, to be a mere chattel interest, and not an estate in land from which dower in its proper sense, can be claimed, and which in *Williams* v. *Holmes*, 9 Md. 289, was held distributable by the Orphans' Court. There can be no reason for discriminating in this respect between real and personal estate, since the right to protection springs out of the existence of a marital right violated by a conveyance made with intent to defraud that right. There is no case in Maryland of which we are aware in which the precise question now before us arose, but there is a line of cases strongly suggestive of the disposition with which that question would have been approached if presented in any of these cases. The first of these is *Hays* v. *Henry*, 1 Md. Ch. 337, where Simeon Hays, a married man purchased certain leasehold property, and caused it to be conveyed to Charlotte Henry, a woman with whom he was cohabiting, who a few days later conveyed it to him upon trust for her use during

her life, with remainder to her two children, and upon their death without issue, with remainder to his two children by his wife. Upon a bill filed by the widow after Hays' death, charging that this transaction was a fraud upon her rights, and praying a sale of the property, and the allowance to her of one-third the proceeds after payment of the husband's debts, the Chancellor granted the relief sought, saying: "If the disposition made by the husband be *bona fide*, and no right is reserved to him, then, though made to defeat the claim of the wife, it will be good against her because an act cannot be denounced as fraudulent which the law authorizes to be done. But if it be a mere device or contrivance by which the husband, not parting with the absolute dominion over the property during his life, seeks, at his death, to deny his widow the share of his personal estate which the law assigns to her then it will be ineffectual against her. · One of the badges of fraud in such cases is the retention' of the possession of the property by the husband, after the transfer of title or keeping the deed in his hands after its execution."

That case has been approved and its prineiples applied in *Dunnock* v. *Dunnock*, 3 Md. Ch. 146; *Feigley* v. *Feigley*, 7 Md. 537; *Sanborn* v. *Lang*, 41 Md. 113; *Rabbitt* v. *Gaither*, 67 Md. 100, and *Duttera* v. *Babylon*, 83 Md. 544. In all of these cases the transactions assailed were subsequent to the marriage, but in our opinion they recognize the essential principle upon which the cases everywhere rest, which denounces as fraudulent, conveyances made upon the eve of marriage with intent to defeat the intended wife's marital right. A full and very able consideration of the law involved in this question, is found in the opinion of CHANCELLOR DANIEL M. BATES, in *Chandler* v. *Hollingsworth*, 3 Del. Ch. Rep. 99, already referred to. Before that decision, Mr. Washburn in his law of Real Property laid down the law in accordance with the rule stated in Park on Dower, adversely to the widow's right; but in a subsequent edition of his work speaks of that decision as "an important and leading case," and says: "The Chancellor goes fully and with discrimination into the consid-

eration of the English and American cases, and comes to a clear and satisfactory conclusion that for a man or woman on the eve of marriage, to convey away his or her estate (in this case it was the entire property of the husband), if done without a valuable consideration, and not disclosed to the other party before the marriage, would be so far a fraud *per se* upon the marital rights of the other party, that equity would set it aside, so far as it conflicted with these rights."

Nothing that we have said, however, is to be understood as going beyond the case before us or as laying down the ·rule more broadly than to protect the wife against a voluntary conveyance by the husband of *all* his estate, made on the eve of marriage, without her knowledge, and with the intent of defeating her marital right. As was said in *Feigley* v. *Feigley*, "We do not wish to be understood as carrying this doctrine t o an extent which would impose any restraint upon the husband in the free and unlimited exercise of his right to alienate his property at will　*　*　*　*　provided he does so *bona fide*, and with no design of defrauding her of her just claims upon him and his estate. The *fraudulent intent* in all such cases being the true test of the validity of the transaction."

In cases where such an ante-nuptial conveyance embraces *only a part* of the husband's estate, or where provision is made *out* of his estate for children by a former marriage, the questions thus presented are left open for future consideration as they may arise.

The importance of the question here presented has led us to consider the cases at much length and we fully agree with the conclusion of the learned Judge of the Circuit Court,

> *Decree affirmed with costs to the appellee above and below.*

(Decided January 20th, 1904.)